UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/30/10

------------------------------------X

UNITED STATES OF AMERICA,

        -against-

10 Cr. 127 (RWS)

OPINION

DONNA TILLMAN,

               Defendant.

------------------------------------X

A P P E A R A N C E S:

        Attorneys for United States of America

        PREET BHARARA
        United States Attorney for the
          Southern District of New York
        86 Chambers Street, Third Floor
        New York, NY  10007
        By:  E. Danya Perry, Esq.
          Jonathan S. Kolodner, Esq.

        Attorney for Defendant

        LAW OFFICES OF BETH FARBER
        80 Pine Street, 33rd Fl.
        New York, NY  10005
        By:  Beth Farber, Esq.

**Sweet, D.J.**

Defendant Donna Tillman ("Defendant" or "Tillman") has moved to dismiss the indictment under the Due Process Clause of the Fifth Amendment to the United States Constitution, citing prosecutorial vindictiveness. Upon the facts and conclusions set forth below, the motion is denied.

## PRIOR PROCEEDINGS

On January 21, 2010, the Government filed a criminal complaint against Tillman for violations of 18 U.S.C. §§ 1920, 1001(a)(2), and 3147(1).  On February 18, 2010, Tillman was indicted under these same charges.  On May 21, 2010, Tillman filed the instant motion to dismiss the indictment on grounds of prosecutorial vindictiveness. The motion was marked fully submitted on June 23, 2010.

## FACTS

**1.  Tillman's Conviction on Money Laundering Charges**

On December 20, 2007, Tillman was charged with bank fraud (18 U.S.C. § 1344), money laundering (18 U.S.C. § 1956(a)(1)(B)(i), 1956(h), 1957(a)), and conspiracy (18 U.S.C. § 1349) for her participation in a large-scale fraudulent checks scheme run principally by a co-conspirator named Douglas Shyne.  See United States v. Donna Tillman, No. 07 Cr. 1209 (LTS) (S.D.N.Y.) ("Tillman I").  The chief witness in the Government's case against Tillman was Natasha Singh, Douglas Shyne's wife and a co-conspirator.  Tillman was tried in a bench trial before the Honorable Laura Taylor Swain, held from January 5 through January 9, 2009.  By Order dated April 22, 2009, Tillman was convicted of the money laundering charges and acquitted of the bank fraud charges.  On December 30, 2009, Tillman filed a "Memorandum in Support of Sentencing" which requested a variance to a sentence of probation.  Though the Government had sought a sentence range of 63 to 78 months' imprisonment, the Court held that the appropriate range was 33 to 41 months' imprisonment.  Ultimately, on May 6, 2010, Judge Swain sentenced Tillman to four years' probation with one year of home detention.

In investigating and preparing for trial in Tillman I, the Government states that it learned through

several witnesses, including cooperating witness Natasha
Singh, that Tillman had admitted to committing worker's
compensation fraud beginning in 2004 (the "2004 conduct").
Judge Swain denied the Government's request to allow
evidence of the 2004 conduct to be introduced at trial in
the Government's case-in-chief.  However, during cross-
examination in Tillman I, Tillman testified about the 2004
conduct.  She admitted that during the time she claimed
disability from her Postal Service job, she managed to lead
a "normal," active lifestyle that included driving a car to
and from Virginia shortly after she claimed to have
suffered traumatic injury and "total disability," as well
as going to amusement parks, shopping, and the gym.  (See
Def. Ex. D at 604-07, 618-19.)

Also while preparing for trial in Tillman I, the
Government claims to have learned that Tillman had made
false statements in applications for public assistance,
specifically food stamps. Tillman was cross-examined about
these applications during the Tillman I trial, and again
made certain admissions.  For example, Tillman testified
that her fiancé had lived with her and "help[ed] out" by
contributing some $600 per month toward the household bills
during the time periods relevant to the public assistance

3

applications (id. at 561-63), and admitted that she had not
listed her live-in fiancé and his income, as well as her
own income from disability payments, on the public
assistance applications (id. at 565-66).  While preparing
for trial, the Government also claims to have learned that
Tillman had made another claim of disability from the
Postal Service in September 2008 (the "2008 conduct").  In
its Post-Trial brief in Tillman I, the Government made
several references to the information it had learned in its
investigation of Tillman, and which would serve as the
basis for the charges in Tillman II.


2.  **Tillman's Indictment for Worker's Compensation Fraud
and False Statements ("Tillman II")**


        The Government contends that information
discovered during the preparation for Tillman I regarding
Tillman's alleged commission of several frauds unrelated to
the charges in Tillman I led to an investigation over the
course of the year that followed Tillman I trial.  Thus,
after the evidence came to light that Tillman had allegedly
falsely claimed disability, the United States Postal
Service, Office of Inspector General ("USPS-OIG"), on
December 15, 2008, launched an investigation into Tillman's

4

2008 conduct.  (See Affirmation of AUSA E. Danya Perry
("Perry Aff."); Gov't Ex. A ¶ 7.)  According to the
Government, the investigation involved culling through many
years and countless pages of internal Postal Service and
Department of Labor documents, issuing subpoenas for
medical records, surveillance recordings, and other
records, and surveilling Defendant to determine whether her
claims of total disability were belied by the agents'
observations of her routine activities.  (Id.)

          The Government states that the investigation
continued until January 2010, during which time, among
other things, surveillance of Defendant was conducted by
law enforcement – including on or about August 6, September
6, October 6, and November 7, 2009 – which established that
Defendant was committing disability fraud throughout much
of 2009.  (See, e.g., Def. Ex. H ¶¶ 11-12; Perry Aff. ¶ 7.)
The Government also claims to have gathered evidence to
buttress the charge of worker's compensation fraud relating
to Defendant's 2004 conduct.  (Perry Aff. ¶ 8.)

          The Government further claims to have learned in
the course of its trial preparation that Defendant had made
allegedly false statements in connection with applications

for food stamp benefits in December 2008, shortly before
trial.  On cross-examination at trial, Tillman testified
that she was unaware she was supposed to list on the
application certain information about household income.
(See, e.g., Ex. D at 566.)  However, the Government states
that Tillman repeated the same misstatements and omissions
in a food stamp application in October 2009, months after
the trial in Tillman I.  (Perry Aff. ¶ 9.)  Based upon this
additional, allegedly fraudulent application, the
Government claims it believed Tillman was deliberately, and
without any possibility of inadvertence or mistake,
committing ongoing food stamp fraud.  Thus, by late 2009,
the Government states that it had sufficient evidence to
charge Tillman with this fraud as well.  (Id.)

Tillman was charged with the above conduct by a
Complaint dated January 21, 2010, and was arrested the
following day.  This was before she had been sentenced in
Tillman I, but after she had made her request for leniency.
Tillman was indicted in Tillman II on February 18, 2010 on
three counts: (1) false statements relating to federal
worker's compensation, for the period of April 2004 to
April 2005, under 18 U.S.C. § 1920; (2) false statements
relating to federal worker's compensation, for the period

of September 2008 to January 2010, under 18 U.S.C. §§ 1920
and 3147(1); and (3) false statements on food stamp
applications and certifications, for the period of December
2008 to January 2010, under 18 U.S.C. §§ 1001(a)(2) and
3147(1). These charges relate in significant part to
conduct committed after Defendant was convicted in Tillman
I.

**LEGAL STANDARD**

It is well-settled that the Government retains
"broad discretion" as to whom to prosecute, because the
"decision to prosecute is particularly ill-suited to
judicial review." Wayte v. United States, 470 U.S. 598,
607 (1985). A presumption of regularity supports the
prosecutorial decisions of the Attorney General and United
States Attorneys. See United States v. Armstrong, 517 U.S.
456, 464 (1996) (reversing grant of discovery on
defendant's claim of selective prosecution). As stated by
the Supreme Court in Armstrong, the rationale for the
presumption is that "[e]xamining the basis of a prosecution
delays the criminal proceeding, threatens to chill law
enforcement by subjecting the prosecutor's motives and
decision making to outside inquiry, and may undermine

7

prosecutorial effectiveness by revealing the Government's enforcement policy." Id. at 465 (citations omitted). Accordingly, "[i]n our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute . . . generally rests entirely in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978).

"[T]he decision to prosecute violates due process," despite the presumption of regularity, "when the prosecution is brought in retaliation for the defendant's exercise of his legal rights." United States v. White, 972 F.2d 16, 19 (2d Cir. 1992), citing Blackledge v. Perry, 417 U.S. 21, 27 (1974); United States v. Khan, 787 F.2d 28, 31 (2d Cir. 1986); accord United States v. LaPorta, 46 F.3d 152 (2d Cir. 1994); see also Bordenkircher, 434 U.S. at 363 ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort."). The defendant bears the burden of establishing that the challenged prosecution is "an impermissible response to noncriminal, protected activity," rather than the presumed "legitimate response to perceived

8

criminal conduct." United States v. Goodwin, 457 U.S. 368, 373 (1982).

"Actual vindictiveness" is the desire to punish a defendant, not for the crimes the defendant committed, but instead for the exercise of a constitutional right. Actual vindictiveness "must play no part in a prosecutorial or sentencing decision." United States v. King, 126 F.3d 394, 397 (2d Cir. 1997); see also Bordenkircher, 434 U.S. at 363. "The need to avoid the appearance of vindictiveness has taken the form of a presumption of prosecutorial vindictiveness… applied when (but only when) the circumstances of a case pose a 'realistic likelihood' of such vindictiveness." King, 126 F.3d at 397 (citing Goodwin, 457 U.S. at 373; Blackledge, 417 U.S. at 27.) "Accordingly, an indictment will be dismissed if there is a finding of 'actual' vindictiveness, or if there is a presumption of vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's action." United States v. Johnson, 171 F.3d 139, 140 (2d Cir 1999)(per curiam).

Thus, for example, where a defendant successfully appeals his conviction, it would violate due process for

9

the judge to impose on remand a harsher sentence for the same conduct in retaliation for the defendant's exercise of his right to appeal.  North Carolina v. Pearce, 395 U.S. 711, 725-26 (1969).  Nor may the prosecutor bring a felony indictment in order to punish a defendant for exercising his right to appeal a misdemeanor conviction for the same conduct.  Blackledge, 417 U.S. at 27-28. That does not mean that a defendant who appeals his sentence cannot receive a higher sentence for the same conduct on remand.  See Texas v. McCullough, 475 U.S. 134, 138 (1986) (affirming 50-year sentence following retrial, notwithstanding 20-year sentence imposed at initial trial).  A longer sentence is permissible, so long as the articulated reason for imposing such a sentence is something other than a simple desire to punish a defendant for exercising his right to appeal.  Id. at 143 (expressing "no doubt about the constitutional validity of higher sentences [following an appeal] in the absence of vindictiveness")(citation omitted); see also Wasman v. United States, 468 U.S. 559, 571-72 (1984).

There are two ways that a defendant may prove that she has been the victim of a vindictive prosecution. First, a defendant may present direct evidence of "actual" animus towards her.  Johnson, 171 F.3d at 140.  This

10

standard requires the defendant to establish that "(1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse,' and (2) [the defendant] would not have been prosecuted except for the animus." United States v. Sanders, 211 F.3d 711, 716-7 (2d Cir. 2000) (quoting United States v. Koh, 199 F.3d 632, 640 (2d Cir. 1999)).  This standard will only be met in rare cases.  Johnson, 171 F.3d at 140.

Alternatively, where the circumstances suggest that "a reasonable likelihood of vindictiveness exists," then a rebuttable presumption of vindictiveness arises, shifting to the Government the burden of proving a legitimate motive for the challenged action.  Goodwin, 457 U.S. at 373.  Such a rebuttable presumption arises only where the circumstances would suggest a reasonable likelihood of vindictiveness that would be "applicable in all cases."  Sanders, 211 F.3d at 717 (citation omitted). It is not enough for the defendant to establish that a prosecutor acted after the exercise of a right by the defendant.  The "link of vindictiveness cannot be inferred simply because the prosecutor's actions followed the

11

exercise of a right, or because they would not have been taken but for the exercise of a defensive right." United States v. Gallegos-Curiel, 681 F.2d 1164, 1169 (9th Cir. 1982)(citation omitted).  Rather, the appearance of vindictiveness only occurs where, "as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for hostility or a punitive animus towards the defendant because [she] has exercised [her] specific legal rights." Id. (citing Goodwin, 457 U.S. at 380; United States v. Robinson, 644 F.2d 1270 (9th Cir. 1981)).

Whichever method of proof a defendant employs, the ultimate question always remains whether the particular action challenged was the product of a vindictive motive – a desire to retaliate against a defendant for the exercise of a constitutional right – or a proper motive, such as the desire to punish for the underlying criminal conduct. Where the proof ultimately shows no vindictive motive, a vindictive prosecution claim fails.  See McCullough, 475 U.S. at 138 (1986).

The Second Circuit has repeatedly rejected claims that circumstances other than those presented in Pearce and

12

Perry raise a presumption of vindictiveness.  See, e.g.,
Lane v. Lord, 815 F.2d 876, 878 (2d Cir. 1987) (no
presumption of vindictiveness where Government adds
conspiracy count following mistrial in order to allow
admission of "other crimes" evidence); Sanders, 211 F.3d at
719 (no presumption of vindictiveness arises where
prosecution instituted after defendant challenged findings
of government agency and refused to reveal source of
information on which challenge based); Koh, 199 F.3d at 639
(no presumption of vindictiveness in shift from state to
federal prosecution); Johnson, 171 F.3d at 141 ("[N]ew
federal prosecution following acquittal on separate charges
does not, without more, give rise to a presumption of
vindictiveness"); Paradise v. CCI Warden, 136 F.3d 331,
335-36 (2d Cir. 1998) (no presumption of vindictiveness
where state brought charge punishable by death after
defendant won dismissal on statute of limitations grounds
of lesser charges); United States v. White, 972 F.2d 16, 19
(2d Cir. 1992) (no presumption of vindictiveness where
prosecution instituted after defendant opposed Government
effort to obtain civil forfeiture); United States v. Lizza
Indus., 775 F.2d 492, 495-96 (2d Cir. 1985) (no presumption
where, following mistrial, Government adds count charging
defendant with perjury at first trial).

Even where a presumption of vindictiveness arises, the Government may rebut the presumption.  All that is required is a showing of "non-vindictive motivations," which can be accomplished by showing "legitimate, articulable, objective reasons" for the challenged action. King, 126 F.3d at 399 (citing United States v. Contreras, 108 F.3d 1255, 1263 (10th Cir. 1997)).  Acceptable reasons include a desire to increase the likelihood of conviction. King, 126 F.3d at 399-400; United States v. Brown, 298 F.3d 392, 406 (5th Cir. 2002) ("strengthen[ing] the Government's case" is a non-vindictive purpose).  To rebut the presumption, the Government need not show that the newly brought charges could not have been brought earlier.  King, 126 F.3d at 399 (rejecting standard for rebutting presumption of vindictiveness that requires Government to show that more serious charge could not possibly have been brought in first instance).

**THE MOTION TO DISMISS IS DENIED**

Tillman contends that the Government brought additional charges against her in retaliation for her letter seeking a probationary sentence.  Defendant has

14

presented no direct evidence of vindictiveness that led to the prosecution's filing charges in Tillman II which it otherwise would not have filed. However, she has presented sufficient circumstantial evidence to create a rebuttable presumption of vindictiveness. Tillman argues that three factors supported her charge of prosecutorial vindictiveness: (1) the timing of the indictment in Tillman II, filed on the heels of the Defendant's December 30, 2009 letter seeking a probationary sentence, despite the fact that the prosecution had been made aware of the much of the conduct at issue in Tillman II in 2008; (2) the nature of the charges, which Tillman contends are "very minor crimes"; and (3) the position taken by the Government at sentencing in Tillman I, including seeking a sentence of 63 to 78 months' imprisonment and using an "overly aggressive and vitriolic tone." (Def. Br. 3.)

Ultimately, however, the Government has provided a clear explanation of its prosecution in Tillman II sufficient to rebut the presumption of vindictiveness raised by Defendant's claims.

15

a.  **The Timing of the Indictment in Tillman II is Justified by the Government's Investigation of the Facts Underlying the Indictment**

According to the Government, the investigation culminating in the Tillman II indictment began around the time of the trial in Tillman I and continued throughout 2009 and into early 2010.  (See Def. Ex. H ¶¶ 11-12; see generally Perry Aff. ¶¶ 6-12.) The final decision to charge was made in mid-November 2009, approximately six weeks before Defendant filed her sentencing request.  (Perry Aff. ¶ 12.)

Defendant claims that "the government possessed all the evidence needed to bring the charges long before January 21, 2010." (Def. Br. 17.)  However, the record does not support this claim.  While the Government learned about the 2004 conduct from a cooperator and had obtained Defendant's September 2008 disability claim and December 2008 public assistance application just before the January 2009 trial, that limited knowledge did not require the Government to bring charges without further investigation. Instead, the Government conducted a year-long investigation with the appropriate law enforcement agency, the USPS-OIG,

16

which included obtaining and analyzing voluminous materials
and conducting many instances of surveillance and
recordings. (Perry Aff. ¶ 7, 10.)  With respect to the 2008
conduct, the Government states that it could not have
charged Defendant until after it had gathered evidence to
show that Defendant's claim of disability was false,
including the agents' surveillances and video surveillance
recordings allegedly showing that Defendant did not appear
impaired in the way she had claimed. (See Perry Aff. ¶ 7.)
With respect to the 2004 conduct, the Government explained
that it not only sought additional evidence of that conduct
over the course of the investigation, but it also awaited
evidence of the 2008 conduct to strengthen the proof
regarding the 2004 conduct and for reasons of effectiveness
and efficiency.  (Id. ¶ 8.)  With respect to the public
assistance applications, the Government notes that
Defendant filed allegedly fraudulent applications after the
Tillman I trial.  (Id. ¶ 9.)  Based on its receipt of
significant evidence from September to mid-November 2009,
the Government claims to have made the final charging
decision at that time, approximately six weeks before
Defendant filed her sentencing request in Tillman I.  (Id.
¶ 12.)  Though it had made its decision to file charges in
mid-November, the Government continued with its

17

investigation, including further surveillance of the defendant, until early 2010 when it filed the Complaint. (Id. ¶ 12.)  The two month gap between the decision to bring charges and the actual filing the Complaint does not suggest vindictiveness, but rather that the Government chose to more fully investigate the defendant's allegedly criminal conduct before filing charges.  Cf. Goodwin, 457 U.S. at 382 n. 14 ("Certainly, a prosecutor should not file any charge until he has investigated fully all of the circumstances surrounding a case.").

The instant charges were filed before Tillman was sentenced in Tillman I.  Because there was no court action adverse to the Government, Tillman relies solely on her sentencing request as the catalyst that caused the alleged vindictive response, that is, that "[t]he charges in the instant case were filed as a direct response to Ms. Tillman's request for leniency at sentencing in the first prosecution."  (Def. Br. 2.) Yet the mere request for leniency is hardly unusual, and it is unlikely that such a routine request would provoke a vindictive response.

The timing of the charges in Tillman II appears to be the result of a careful and thorough investigation,

18

rather than a vindictive response to the filing of a routine request for leniency, and thus does not suggest a vindictive motive on the part of the Government.

**b.  The Tillman II Charges are Worthy of Prosecution**

Tillman contends that the conduct at issue in Tillman II constitutes "very minor crimes" that ordinarily are dealt with by civil proceedings.  (Def. Br. 19.)  This contention misrepresents the gravity of the offenses at issue.

Tillman II was investigated by USPS-OIG, which is likely to consider the possibility of repeated and successful fraudulent claims of disability over a number of years to be a substantial concern.  (See Perry Aff. ¶ 7.)  Moreover, the Government notes that the amount of money Tillman is alleged to have fraudulently obtained, and stood to obtain continuing into the future as a result of the alleged conduct, was considerable.  According to the Government, Defendant received at least approximately $40,000 in disability payments as a result of her allegedly false disability claim in 2009 alone, and was receiving approximately $800 per month in food stamp benefits based

19

upon her allegedly false statements.  (Id. ¶¶ 7, 9.)
Furthermore, the Government claims that Defendant had
claimed disability from the Postal Service no fewer than
six times over the course of her employment there; had
received payments for allegedly fraudulently claimed
disability on two separate occasions over several years;
and stood to receive payments on a going-forward basis due
to her repeated, allegedly false, claims.  (See generally
Cmpl.; Perry Aff. ¶ 11.)  The Complaint alleges that
Defendant continued to file false benefits applications
after her cross-examination at trial, when it was made
clear to her that she was required to list all the
information called for by the application.  Moreover,
Defendant is alleged to have committed disability fraud and
submitted false statements on food stamp applications while
she was released on bail in connection with Tillman I.  See
18 U.S.C. § 3147 (providing enhanced penalties for the
commission of additional crimes while on pre-trial release
pursuant to an order of the court, as Tillman is alleged to
have done here).

        The accusations against Defendant in Tillman II
are of a serious nature worthy of prosecution and therefore
do not raise the specter of vindictiveness.

20

**c.   The Government's Sentencing Position in Tillman I Was Not Vindictive**

Defendant claims that, at the sentencing in Tillman I, "the government displayed an overly aggressive and vitriolic tone and requested a sentence which was disproportionately harsh in light of the nature of the offense, Ms. Tillman's personal history, and the sentences which had been given to other defendants in that case." (Def. Br. 3.)  However, the Government's sentencing position in Tillman I appears to conform to the general policy of the Government to seek a sentence within the range called for by the United States Sentencing Guidelines and does not suggest any vindictiveness toward Tillman.

In her sentencing memorandum, Defendant referred to her "otherwise law abiding life," and argued that "the offense conduct fits the definition of 'aberrant behavior' set forth in § 5K2.20" of the Sentencing Guidelines.  (See Def. Ex. F at 9.)  To rebut that argument, the Government argued that Defendant's conduct in Tillman I was far from aberrant, suggesting that not only was Tillman's conduct in that case extensive and deliberate, but she had repeatedly

committed additional acts of lying and fraud in the past.
(See Gov't. Ex. I at 21-25.)  The Government also argued in
its submission, and Judge Swain agreed, that Tillman should
be given a two point enhancement for obstruction of justice
for her false testimony at trial, and that she was not
entitled to either a minor role adjustment or a downward
departure under U.S.S.G § 5K2.20 because her conduct was
not aberrant. (See Gov't Ex. B at 10-13, 22.)

Judge Swain disagreed with the Government's
argument that Tillman was also responsible for the conduct
of co-conspirators Ayana Thomas and Raymond Pastures,
holding that their conduct was not reasonably foreseeable
to Tillman and declining to hold Tillman accountable for
the losses attributable to them.  (Id. at 10.)  However,
Judge Swain's rejection of the Government's position on
this issue does not suggest that its sentencing brief was
retaliatory or indicative of vindictiveness toward
Defendant.

The Government explains that its Guidelines range
calculation of 63 to 78 months' imprisonment was in part
driven by the losses it believed were attributable to
Tillman.  Judge Swain disagreed with the Government with

22

respect to loss attribution and found that the appropriate advisory Guidelines range was 33 to 41 months. (See Gov't Ex. B at 13, 21.) Judge Swain determined that a non-custodial sentence was warranted because she found that no alternative care existed for Tillman's young daughter, (see id. at 24), but repeatedly stressed the seriousness and deliberateness of Tillman's offense (id. at 25, 32).

Accordingly, the Government's advocacy for a Guidelines sentence that it believed proper under the law and facts, and its opposition to Defendant's arguments, though ambitious, is not evidence of malice, animus, or vindictiveness.

**CONCLUSION**

Based upon the facts and conclusions set forth above, Defendant's motion is denied.

It is so ordered.

New York, NY
July 28, 2010

ROBERT W. SWEET
U.S.D.J.

23