UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

    - against -

DONNA TILLMAN,

             Defendant.

------------------------------------X

10 Cr. 127-01 (RWS)

SENTENCING OPINION

**Sweet, D.J.**

      On February 1, 2011, Donna Tillman ("Tillman" or "Defendant") was found guilty of three counts of making false statements, in violation of 18 U.S.C. §§ 1001(a)(2) and 1920. For the reasons set forth below, Tillman will be sentenced to 18 months' imprisonment to be followed by 3 years' supervised release.  Tillman will also be required to pay restitution in the amount of $90,709.65 and a special assessment of $300.

## Prior Proceedings

      On February 18, 2010, Indictment 10 CR 127 (RWS) was filed in the Southern District of New York.  Count 1 charges that from April 2004 through April 2005, in the Southern

1

District of New York and elsewhere, Tillman falsely stated and represented, and caused others to represent, in her application for federal compensation for work injuries, that she was disabled during the periods in which she applied for such compensation, in violation of 18 U.S.C. § 1920.  Count 2 charges that from September 2008 through January 2010, in the Southern District of New York and elsewhere, Tillman falsely stated and represented, and caused others to represent, in her application for federal compensation for work injuries, that she was disabled during the periods in which she applied for such compensation, in violation of 18 U.S.C. §§ 1920 and 3147(1). Count 3 charges that from December 2008 though December 2010, in the Southern District of New York and elsewhere, Tillman, in applications and certifications for federally funded food stamp benefits, falsely stated, among other things, that neither she nor anyone with whom she lived had any income (other than certain benefits for her son), whereas Tillman's fiancé, with whom Tillman resided, had income from the Postal Service and contributed to household expenses, in violation of 18 U.S.C. §§ 1001(a)(2) and 3147(1).

On February 1, 2011, Tillman was found guilty of Counts 1 through 3 after a jury trial before the Honorable

2

Robert W. Sweet in the Southern District of New York.

On May 18, 2011, the Court received a memorandum from Tillman's counsel, including a psychological evaluation and interviews with her children, requesting that Court be lenient when imposing a sentence in light of Tillman's personal background and characteristics, her family responsibilities, the loss amount at issue, the effectiveness of probation, and Tillman's efforts to improve herself. On May 25, 2011, the Court received a sentencing memorandum from the Government responding to Defendant's contentions and arguing for a higher sentencing range.

Tillman's sentencing is scheduled for June 6, 2011.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Guidelines. Thus, the

sentence to be imposed here is the result of a consideration of:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)    the need for the sentence imposed —

        (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)    to afford adequate deterrence to criminal conduct;

        (C)    to protect the public from further crimes of the defendant; and

        (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3)    the kinds of sentences available;

    (4)    the kinds of sentence and the sentencing range established for —

        (A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

    (5)    any pertinent policy statement . . . [issued by the Sentencing Commission];

    (6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

    (7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether

that sentence is a so-called Guidelines sentence or not.   See
Crosby, 397 F.3d at 114-15.


**The Defendant**


The Court adopts the facts set forth in the
Presentence Investigation Report ("PSR") with respect to
Tillman's personal and family history.


**The Offense Conduct**


The following description draws from the PSR.   The
specific facts of the underlying conduct are adopted as set
forth in that report.


The instant offense was investigated by the United
States Postal Service (USPS), Office of the Inspector General.


Beginning in late 1998 until her resignation in
November 2009, Tillman was employed by the USPS as a mail
handler at a postal facility in Manhattan.   On May 4, 2004,
Tillman completed, signed, and filed a Form CA-1, entitled
"Federal Employee's Notice of Traumatic Injury and Claim for

Continuation of Pay/Compensation" (Form CA-1).  On her Form CA-1 and in a written statement submitted on May 24, 2004, in connection with that form, Tillman stated that she had sustained a head injury on the job.

As a result of filing the Form CA-1, Tillman received continuation of pay benefits, meaning that she continued to receive her full salary despite her absence, from the USPS until June 13, 2004.

In her Form CA-1, Tillman claimed that she sustained an injury to her head as a result of being hit by a bulk mail container on April 29, 2004.  However, Tillman did not report the alleged injury until May 4, 2004.  Further, Tillman's supervisors stated that, "[o]n the date of the alleged injury, Ms. Tillman refused medical treatment," and indeed continued working for an additional six hours and then worked overtime. The USPS also noted that from January 10, 2004 through April 29, 2004, Tillman had only worked a total of 10 days, and had exhausted all of her leave.  In its recommendation to the Department of Labor (DOL) claims examiner, the USPS concluded that Tillman had not established proof of injury and that her claim should be denied.

6

As a result of her claim for compensation for alleged
work injuries in 2004, between June 14, 2004 and April 15, 2005,
Tillman received compensation for her alleged work injuries from
the DOL.  During that time, Tillman completed, signed, and filed
certain Forms CA-7, entitled "Claim for Compensation" (Forms CA-
7).  On these Forms CA-7, Tillman affirmed, subject to criminal
penalties, that the claims for compensation were for an injury
sustained in the performance of her duty as a federal employee,
that she had been disabled because of this injury, and that she
had not refused or failed to perform any work she was able to do
during the periods for which compensation was claimed.

In connection with Tillman's claim of disability, a
"Disability Certificate" completed by Tillman's chosen physician
(the physician), was filed with DOL.  On that form, dated June
15, 2004, the physician reported that Tillman was "totally
disabled," and was unable to work due to the injury she had
allegedly sustained at the USPS.  In a form filed with the DOL
on August 12, 2004, Tillman's physician stated that Tillman was
unable to return to work.  In these forms and other forms
submitted by the physician, it appears that Tillman's chief
complaint was that she suffered from headaches.

On October 26, 2004 and again on or about November 22, 2004, the DOL scheduled second opinion appointments for Tillman, neither of which she attended.  Eventually, the DOL suspended further payment to Tillman until she attended a second opinion appointment.  Thereafter, Tillman did attend her required second opinion appointment, and the second opinion physician issued a report on January 20, 2005, finding that Tillman suffered no neurological impairment and was not disabled from working.

On April 4, 2005, Tillman's own physician concurred in the second opinion findings, and returned Tillman to full duty with no restrictions, whereupon Tillman did return to the USPS for work.  Tillman requested an oral hearing in this case but failed to appear for her hearing scheduled for July 20, 2005.

On January 7 and 8 of 2009, Tillman testified under penalty of perjury (the court testimony) relating to Tillman's use of her bank card in or about the spring and summer of 2004. Tillman stated that on June 7, 2004, Tillman drove herself and her then-boyfriend (the boyfriend) from New York to Richmond, Virginia, where she spent thousands of dollars at various retail outlets, and then drove back to New York, where she continued to

make many additional purchases.  According to her own court

testimony and that of a sworn witness in that proceeding,

Tillman thereafter spent a great deal of time driving around

town in her boyfriend's car and shopping.  That summer,

according to Tillman's court testimony, Tillman also joined a

gym and went to an amusement park, among other things, and

conducted "pretty much normal activities for the summer of

2004."  Tillman stated that in 2004, she was "being paid

disability," but could not recall whether she was not working

due to a disability or due to "stress."  Later in the court

testimony, Tillman stated that, during the time she was on

disability leave, she "didn't suffer from any other ailments

other than... headaches."


        Further, in a public assistance form that Tillman

filed on October 20, 2005 in order to receive emergency rental

assistance, Tillman stated that she had not been in a work-

related accident in the two years prior to the date of the

application.


        In 2006, Tillman filed another claim for compensation

for work injuries.  On June 21, 2006, Tillman completed, signed,

and filed a Form CA-1.  On that form, Tillman stated that she

9

had sustained an injury to her lower back, both legs, both ankles, and both heels.  Tillman's supervisors denied that Tillman had ever mentioned a work-related accident, but rather that she had stated that she has long suffered from pain in her legs and feet.  They also noted that she had an "attendance problem" and was on a "last chance basis."

Tillman received a letter from DOL on June 28, 2006, asking for medical substantiation of her claim and noting that her supervisors disputed her claim of traumatic on-the-job injury.  On July 17, 2006, Tillman withdrew her claim.  On August 1, 2006, based upon the fact that Tillman had indicated to management that she had long been having leg and foot pain and had never mentioned that the condition was work-related, and because she had failed to submit any supportive medical evidence, her claim for compensation was denied.

In 2008, Tillman filed another claim for compensation for work injuries.  On September 14, 2008, Tillman completed, signed, and filed a Form CA-1.  On that form, Tillman claimed that she had injured her right wrist while pushing a mail tub.  As a result of filing the Form CA-1, Tillman received continuation of pay from the USPS until October 29, 2008.  From

then until January 2010, Tillman received compensation for her
alleged work injuries from the DOL.

During the time in which she received compensation
from the DOL, Tillman completed, signed, and filed certain Forms
CA-7, in which she affirmed, subject to criminal penalties, that
the claims for compensation were for an injury sustained in the
performance of her duty as a federal employee.  In connection
with Tillman's claim of disability, a "Disability Certificate"
by Tillman's physician was filed with DOL.  On that form, dated
September 15, 2008, the physician reported that Tillman was
"totally disabled," and was unable to work due to the injury she
allegedly sustained at the USPS.  In other medical forms filed
by her physician with DOL, the physician recommended that she
attend physical therapy (PT) sessions three or four times a week
and that Tillman wear a wrist brace.

On April 23, 2009, Tillman underwent arthroscopic
surgery on her right shoulder, allegedly for the injury she
claimed to have sustained at the USPS on September 14, 2008.
Following Tillman's shoulder surgery, various medical forms were
filed with DOL by Tillman's treating physicians, indicating that
Tillman had severe restrictions and could not return to work.

11

On numerous occasions, case agents conducted surveillance of Tillman and reviewed videotapes of Tillman from various security cameras.  On July 17, 2009, Tillman's physician stated that Tillman was completely unable to do any driving, pulling, pushing, or reaching above the shoulder, and that she was unable to manipulate her upper extremities.  The physician also stated in a report dated August 19, 2009, that Tillman was experiencing problems lifting her right arm, that she had pain in her right elbow, and that she should undergo PT three to four times per week.  However, in various surveillance tapes from Tillman's trips to supermarkets on August 6, September 6, October 6, and November 7, 2009, Tillman can be seen pulling items off shelves, pushing carts full of groceries, lifting above her right shoulder, and using her right hand, all with apparent ease.

On numerous occasions in late 2009 and early 2010, case agents observed Tillman driving her car, in contravention of the physician's finding that she was unable to drive.  Also, Tillman's physician repeatedly recommended that she wear a wrist support and that she attend PT three to four times a week. Agents observed Tillman on many occasions from January 2009

through January 2010, both in person and on surveillance videos,

and, during that time, Tillman was not wearing a wrist brace or

support.  DOL records indicated that (with the exception of the

period immediately following her shoulder surgery, in which she

attended PT three times in one week), Tillman has never attended

PT more than once or twice a week.

Information provided by the DOL and the USPS regarding

additional claims for compensation for work injuries made by

Tillman revealed that, in addition to the three incidents in

which Tillman requested compensation for alleged workplace

injuries as set forth above, Tillman made three additional

claims for disability compensation, in 1998, 2000, and 2002,

respectively.  Other than a few payments made on these claims,

they were denied.

The New York City Human Resources Administration,

Bureau of Fraud Investigation (HRA), reported that Tillman

applied for food stamp assistance on December 1, 2008, and again

on October 13, 2009.  On these applications, Tillman failed to

list any income for herself, where income was defined to include

both wages and disability payments, among other things.

Further, in response to a question which specifically requested

13

that she list all income not only of herself but of anyone
living with her, Tillman listed only Supplemental Social
Security Income (SSI) for her son.  Despite specific requests
that she list any additional persons who lived with her, even if
they were not applying for benefits, Tillman failed to list
anyone other than herself and her children.  In response to
specific questions, Tillman stated that no one in her household
had any money and failed to list any bank accounts that she
controlled.  Finally, in response to a question regarding her
ownership of any vehicles, Tillman failed to mention that she
had a car.

On May 5, 2009, in a periodic report filed by Tillman
in connection with her ongoing food stamp benefits, Tillman
listed only her son's SSI benefits in response to a question
directing her to list all income for each household member.

As noted earlier, during her court testimony, Tillman
stated that she lived with her fiancé (the fiancé), who assisted
her in paying her monthly bills.  Tillman testified that her
fiancé paid variable amounts, which could be about $600 per
month.  Tillman also stated that she was aware that there were
penalties for false statements made on the food stamp

14

application.  In her court testimony, Tillman acknowledged that
she had failed to list her fiancé as living with her and as
paying household expenses, stating that she did not realize she
had to list those items.  Tillman further stated that she was
not aware that she was required to list her own income on the
food stamp application.  Nevertheless, Tillman failed to correct
this purported error either on her May 5, 2009 periodic report
or on her October 13, 2009 food stamp application.

       At the time Tillman filed the applications for food
stamp assistance she received disability income from the DOL of
approximately $2,500 (net) per month, received monthly household
payments from her live-in fiancé, maintained bank accounts and
had a car registered to her.  Had Tillman listed her true
household income, she would have been ineligible for food stamp
assistance.

       On February 27, 2008, Tillman was arrested on federal
charges of bank fraud, money laundering, and conspiracy, and was
released that same day on certain conditions of bail, which was
ordered by the presiding magistrate judge in the United States
District Court for the Southern District of New York.  As such,

15

Tillman was under an order of release when she applied for federally-funded food stamp benefits.

On January 22, 2010, Tillman was arrested for the instant offense.

Tillman defrauded the Department of Labor, the Human Resources Administration, CUNY and OPM of between $70,000 and $120,000. According to representatives of the DOL, Tillman fraudulently received a total of $70,401. According to representatives of the HRA, Tillman fraudulently received a total of $15,203. According to representatives of CUNY, Tillman fraudulently received a total of $5,106.

Victim statements have been requested from the case agent and are awaited. The DOL has reported that the total loss is $70,400.65 and restitution can be forwarded to: U.S. Department of Labor, 201 Varick Street, Rm. 740, New York, NY 10014. The HRA reported that the total loss is $15,203 and restitution can be forwarded to Deputy Director Curtis Tibbs, District Attorney Prosecution and Administrative Hearing Division, 250 Church Street, 4th Floor, New York, NY 10013. CUNY representatives reported that the total loss is $5,106 and

restitution can be forwarded to Gordon Taylor, CUNY Internal Audit, 230 West 41st Street, New York, NY 10036. Specific loss and restitution information has not been received from OPM.


**The Relevant Statutory Provisions**


For Count 1, pursuant to 18 U.S.C. § 1920, the maximum term of imprisonment is five years. For Count 2, the maximum term of imprisonment is five years, pursuant to 18 U.S.C. § 1920. In addition and pursuant to 18 U.S.C. § 3147(1), an additional term of imprisonment of up to 10 years must be imposed to run consecutive to any period of imprisonment imposed. For Count 3, the maximum term of imprisonment is five years, pursuant to 18 U.S.C. § 1001(a)(2). In addition and pursuant to 18 U.S.C. § 3147(1), an additional term of imprisonment of up to 10 years must be imposed to run consecutive to any period of imprisonment imposed.


If a term of imprisonment is imposed for Counts 1 through 3, a term of supervised release of not more than three years on each count may be imposed, pursuant to 18 U.S.C. § 3583(b)(2). Such terms of supervised release are to run concurrently, pursuant to 18 U.S.C. § 3624(e).

17

For Counts 1 through 3, Defendant is eligible for not less than one nor more than five years' probation per count, pursuant to 18 U.S.C. § 3561(c)(1).  Such terms of probation run concurrently, pursuant to 18 U.S.C. § 3564(b).

The maximum fine that may be imposed for Counts 1 through 3 is $250,000 per count, pursuant to 18 U.S.C. § 3571. A special assessment of $100 per count, for a total of $300, is mandatory, pursuant to 18 U.S.C. § 3013.

Full restitution to the victim is required under 18 U.S.C. §§ 3663A and 3664.   The DOL is owed $70,400.65 in restitution and can be forwarded to: U.S. Department of Labor, 201 Varick Street, Room 740, New York, NY, 10014.   HRA is owed $15,203 and restitution can be forwarded to: Deputy Director Curtis Tibbs, District Attorney Prosecution and Administrative Hearing Division, 250 Church Street, 4th Floor, New York, NY 10013.  CUNY is owed $5,106 and restitution can be forwarded to: Gordon Taylor, CUNY Internal Audit, 230 West 41st Street, New York, NY 10036.

**The Guidelines**

18

The November 1, 2010 edition of the United States
Sentencing Commission Guidelines Manual has been used in this
case for calculation purposes, pursuant to § 1B1.11(a).  The
Court finds the following with respect to Defendant's applicable
offense level, criminal history, recognition of responsibility,
and term of imprisonment:

Pursuant to the grouping rules contained in § 3D1.2,
Counts 1 through 3 (False Statements) are grouped together
pursuant to § 3D1.2(d) because the offense level is determined
largely on the basis of the total amount of loss.  As such,
Counts 1 through 3 will be known herein as "Group 1."

Group 1 - False Statements

The guideline for violations of 18 U.S.C. §§ 1920 and
1001 are found in § 2B1.1, which provides for a base offense
level of six, pursuant to § 2B1.1(a).

Tillman caused a loss of between $70,000 and $120,000.
As such, the offense level is increased by eight levels,
pursuant to § 2B1.1(b)(1)(E).

19

At the time Tillman committed the instant offense, she was under a term of release and thus, a statutory enhancement under 18 U.S.C. § 3147 applies.  As such and pursuant to § 3C1.3, the offense level is increased by three levels.

Accordingly, the applicable offense level is 17.

On February 26, 2008, Tillman was arrested and charged with Money Laundering Conspiracy, Money Laundering and Monetary Transactions in Property Derived from Specified Unlawful Activity.  She was convicted on these charges.  On May 6, 2010, Tillman was sentenced in the United States District Court for the Southern District of New York to 4 years' probation, 12 months' home confinement, 40 hours' community service per month for 36 months, $110,000 in restitution, and a $300 special assessment.  Pursuant to §§ 4A1.1(c) and 4A1.2(e)(2), this conviction warrants one criminal history point.

A total of one criminal history point establishes a Criminal History Category of I, pursuant to the table at Chapter 5, Part A, of the Guidelines.

Based on a total offense level of 17 and a Criminal History Category of I, the Guidelines range for imprisonment is 24 to 30 months.

The Guidelines range for a term of supervised release is two to three years, pursuant to § 5D1.2(a)(2). If a sentence of imprisonment of one year or less is imposed, a term of supervised release is not required but is optional, pursuant to § 5D1.1(b). Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute, pursuant to § 5D1.1(a).

Because the applicable Guidelines range is in Zone D of the Sentencing Table, the defendant is not eligible for probation, pursuant to § 5B1.1, Application Note #2.

The fine range for the instant offense is from $5,000 to $50,000, pursuant to § 5E1.2(c)(3)(A) and (c)(3). Subject to Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to § 5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of

21

$2,157.88 to be used for imprisonment, a monthly cost of $311.94 for supervision, and a monthly cost of $1,990.13 for community confinement.

Pursuant to § 5E1.1(a)(1), in case of an identifiable victim, the Court shall enter a restitution order for the full amount of the victim's loss if such order is authorized under 18 U.S.C. § 3663A.

## The Remaining Factors of 18 U.S.C. § 3553(a)

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103. In light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)), and having considered the Guidelines and all of the factors set forth in § 3553(a), it is determined that a downward departure from the Guidelines

22

sentence is warranted in the instant case. Specifically, a downward departure is justified under § 3553(a) by Tillman's personal difficulties and circumstances and her efforts to better herself, as indicated by her probation officer. These efforts include good performance in her position with the Parks Department, enrollment in counseling, and consistent restitution payments.

## The Sentence

For the instant offense, Tillman will be sentenced to 18 months' imprisonment and 3 years' supervised release.

Tillman is directed to report to the nearest United States Probation Office within seventy-two hours of release to commence her term of supervised release. It is recommended that Tillman be supervised by the district of her residence.

As mandatory conditions of her supervised release, Tillman shall: (1) not commit another federal, state, or local crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; and (4) cooperate in the collection of DNA as directed by the probation officer. The

23

mandatory drug testing condition is suspended based on the Court's determination that Defendant poses a low risk of future substance abuse.

Furthermore, the standard conditions of supervision (1-13), set forth in the judgment, shall be imposed with the additional special conditions:

(1)   Defendant shall participate in a mental health program approved by the U.S. Probation Office.  Defendant shall continue to take any prescribed medications unless otherwise instructed by the health care provider.  Defendant shall contribute to the costs of services rendered not covered by third-party payment, if Defendant has the ability to pay.  The Court authorizes the release of available psychological and psychiatric evaluations and reports to the health care provider.

(2)   Defendant shall provide the probation officer with access to any requested financial information.

(3)   Defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless Defendant is in compliance with the

installment payment schedule.

In consideration of all the factors set forth in 18 U.S.C. § 3572(a), it does not appear that the Defendant is able to pay a fine, and so the fine in this case shall be waived.

A special assessment of $300, payable to the United States, is mandatory and shall be due immediately.

It is further ordered that Defendant shall make restitution payable to the Clerk, U.S. District Court, 500 Pearl Street, New York, NY 10007, for disbursement to the following persons in the following amounts:

$70,400.65 - U.S. Department of Labor, 201 Varick Street, Room 740, New York, NY, 10014.

$15,203 - HRA, Deputy Director Curtis Tibbs, District Attorney Prosecution and Administrative Hearing Division, 250 Church Street, 4th Floor, New York, NY 10013.

$5,106 - Gordon Taylor, CUNY Internal Audit, 230 West 41st Street, New York, NY 10036.

25

If Defendant is engaged in a BOP non-UNICOR work program, Defendant shall pay $25 per quarter toward the criminal financial penalties.  However, if Defendant participates in the BOP's UNICOR program as a grade 1 through 4, Defendant shall pay 50% of her monthly UNICOR earnings toward the criminal financial penalties, consistent with BOP regulations at 28 C.F.R. §545.11. Any payment made that is not payment in full shall be divided proportionately among the persons named.

The remainder of restitution shall be paid in monthly installments of at least $200 over a period of supervision to commence 30 days after the date of the judgment or the release from custody if imprisonment is imposed.

In formulating the suggested schedule of payments for restitution, the provisions of 18 U.S.C. § 3664(f)(2) have been considered.

The defendant shall notify the United States Attorney for this district within 30 days of any change of mailing or residence address that occurs while any portion of the restitution remains unpaid.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for June 6, 2011.

It is so ordered.

New York, NY
June    , 2010

_____

ROBERT W. SWEET
U.S.D.J.